## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 06-271 (PLF)** |
| | ) | |
| **GUSTAVO VILLANUEVA-SOTELO** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this Opposition to Defendant's Motion to Suppress Physical Evidence. In support of this opposition, the Government relies upon the points and authorities set out in this memorandum and at any hearing on this matter.

## I.    FACTUAL BACKGROUND

1.    A Grand Jury has returned an indictment charging defendant with one count each of Unlawful Reentry of a Removed Alien, in violation of 8 U.S.C. §§ 1326(a) and (b)(1), Possession of a Fraudulent Document Prescribed for Authorized Stay or Employment in the United States, in violation of 18 U.S.C. § 1546(a), and Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1).

2.    The Government expects the evidence at trial to prove that on or about June 15, 1990, defendant, Gustavo Villanueva-Sotelo, a native and citizen of Mexico, was arrested in Oroville, Washington, for shoplifting. Defendant subsequently pleaded guilty to theft and was sentenced to ten days in jail. Following his conviction and sentence, an immigration judge ordered that defendant be removed from the United States. On July 6, 1990, defendant was

deported from the United States to Mexico.

3.    Subsequent to his removal, defendant reentered the United States in violation of federal law.  On July 5, 1991, federal officials in the state of Washington arrested defendant for illegally reentering the United States and various other violations of federal immigration law.  At the time of this arrest, defendant was found in possession of numerous fraudulent immigration documents, including partially completed social security cards and alien registration cards.  As a result of this arrest, defendant pleaded guilty, in the United States District Court for the Eastern District of Washington, to Alien in the United States after Deportation, in violation of 8 U.S.C. § 1326(a), Possession of False Immigration Documents, in violation of 18 U.S.C. § 1546(a), and Possession of Five or More False Identification Documents with Intent to Transfer Them, in violation of 18 U.S.C. § 1028(a).  On August 22, 1991, defendant was sentenced to two months' imprisonment, and, on September 23, 1991, defendant was again deported from the United States to Mexico.

4.    Prior to defendant's arrest on August 5, 2006, federal law enforcement agents were investigating the fraudulent identity document trade taking place in the area of the 1600 block to the 1800 block of Columbia Road, N.W., Washington, D.C.  From this investigation, it was learned by agents that defendant at some point had returned to the United States and that he was a principal participant in the fraudulent identity document trade.  Because of this information, U.S. Immigration and Customs Enforcement ("ICE") Special Agent Mark Leeper maintained a file of defendant.

5.    On or about August 5, 2006, agents received information from a reliable, confidential informant that defendant, whom the informant knew by name, was at a park in the

2

1700 block of Columbia Road, N.W., sitting on a bench.  The informant further told agents that defendant would be wearing long white pants, a red shirt, and that he would either be wearing or holding in his hand a dark-colored hat.[1]

6.     After receiving this information from the confidential informant, Special Agent Leeper contacted Metropolitan Police Department's ("MPD") Third District station and requested officers' assistance in locating and detaining defendant, whom Leeper was trying to locate for illegal reentry into the country.  Leeper provided to police defendant's full name and nickname, "Chetos," and further advised that defendant had just been observed sitting on a bench in the 1700 block of Columbia Road, N.W., and that he would be wearing white pants, a red shirt, and either wearing or carrying a dark-colored hat.

7.     Third District MPD Officer Frank Servis responded to Special Agent Leeper's call for assistance. Upon his arrival in the 1700 block of Columbia Road, N.W., Servis saw defendant sitting on one of two or three benches in the area, wearing white pants, a red shirt, and carrying a dark-colored hat in his hand.  Having confirmed the information provided to him by Leeper, Officer Servis approached defendant and requested some identification.  Defendant produced a Mexican driver's license, which bore his true name, Gustavo Villanueva-Sotelo.  Upon learning that defendant's name matched the name of the suspect given to him by Special Agent Leeper, Officer Servis took defendant into custody and drove him to the Third District police station,

---

[1] According to Special Agent Leeper, he and his partner Heath Simon had worked with the confidential informant for over a year.  The informant had provided a significant amount of information to Leeper and Simon, which often resulted in further investigations that led to a number of arrests and deportations of illegal aliens.  Of the information provided to Leeper and Simon by the informant that was subsequently investigated, there was never an occasion where such information was learned to be incorrect.

where Leeper later arrived and confirmed that defendant was the same Gustavo Villanueva-Sotelo he had been trying to locate pursuant to his investigation.  A search of defendant's person incident to his arrest revealed three fraudulent immigration documents, including a fraudulent permanent resident card that bore his name, $918.05 in U.S. currency, and assorted jewelry.

**II.____ARGUMENT**

8.    Defendant argues that police were without any reasonable articulable suspicion to determine that he was engaged in any criminal conduct to justify his detention on August 5, 2006.  See Defendant's Motion, pages 1-2.  Defendant's argument is entirely without merit. Initially, Officer Servis's very brief encounter with defendant consisted of approaching defendant and asking him for some form of identification.  This did not amount to a "seizure," a "detention," or a "stop" that required the officer to have reasonable suspicion of criminal activity. Thus, Officer Servis could approach and ask defendant questions about his identity.  Moreover, even if reasonable suspicion were required to justify an officer's approaching and asking questions concerning identification, in this case there was abundant reasonable suspicion that defendant was illegally in the United States warranting Officer Servis's initial encounter with defendant.  Finally, defendant revealed his correct name and Officer Servis corroborated that defendant was the same individual that Special Agent Leeper sought to arrest as an illegal alien. Therefore, Officer Servis had probable cause to place defendant under arrest, and a search of defendant's person following his arrest was a lawful search incident to the arrest.

**A.    Officer Servis's Initial Encounter With Defendant Was Not a "Seizure" Requiring Reasonable Suspicion to Justify the Stop.**

4

9.    A law enforcement officer's interrogation "relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." INS v. Delgado, 466 U.S. 210, 216 (1984); see also United States v. Woods, 720 F.2d 1022, 1026 (9th Cir. 1983).  Moreover, an officer who merely approaches an individual on the street and asks him if he is willing to answer some questions, or puts questions to him if the person is willing to listen, is not conducting a Terry stop which therefore requires the existence of reasonable suspicion to justify the stop.  Florida v. Royer, 460 U.S. 491, 497 (1983); Dunaway v. New York, 442 U.S. 200, 210 n.12 (1979); Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968); see also Florida v. Bostick, 501 U.S. 429, 434 (1991) (holding that "mere police questioning does not constitute a seizure").  "Of course, the person approached need not answer any question put to him, or he may decline to listen to the questions and may simply go on his way.  Royer, 460 U.S. at 498-99 (citation omitted); see also Woods, 720 F.2d at 1026 ("The person so questioned [by police] need not answer any questions is legally free to ignore the officer, or to walk away.").

10.    In United States v. Smith, 901 F.2d 1116, 1118 (D.C. Cir. 1990), the D.C. Circuit Court of Appeals held that "an encounter between a police officer and a citizen, involving no more than approach, questioning, and official identification, does not constitute a seizure and does not require probable cause, articulable suspicion, or any other kind of objective justification by police.  901 F.2d at 1118 (citation and internal quotation marks omitted).  Similarly, in United States v. Nurse, 916 F.2d 20, 23 (D.C. Cir. 1990), the Court concluded that an officer's initial encounter with the defendant, in which he approached her, identified himself as a police officer, and questioned her, "d[id] not amount to a 'seizure,' 'detention,' or 'stop' under the Fourth Amendment," therefore, the officer's initial encounter with the defendant "does not raise constitutional concerns."  See also United States v. Winston, 892 F.2d 112, 115 (D.C. Cir. 1989)

(concluding that an officer, who lacked any articulable suspicion, approached a suspect, identified himself, and asked a series questions that resulted in a request to search suspects' bags, did not seize the person for Fourth Amendment purposes, therefore, the officer's lack of articulable suspicion prior to the approach and questioning was unobjectionable by the defendant).

11.     Likewise, in the instant case, Officer Servis's initial encounter with defendant, which consisted merely of approaching him and asking to see some form of identification, did not amount to a detention, seizure, or even a Terry stop of defendant. Therefore, it is unnecessary to point to the existence of any articulable suspicion prior to the time of Servis's encounter with defendant. Indeed, defendant could have simply refused to interact with Servis, and could have gotten up and walked away. Royer, 460 U.S. at 498-99; see Delgado, 466 U.S. at 216 ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."). Instead, defendant complied with Servis's request and furnished him with his Mexican identification. It was only after Servis inspected defendant's identification and determined that defendant's name matched the suspect sought by Special Agent Leeper that he finally placed defendant into custody. Therefore, absent some claim that Officer Servis somehow compelled defendant to acquiesce with his request to see some identification, see Delgado, 466 U.S. at 216 (finding that unless the circumstances of an officer's encounter with a citizen "are so intimidating as to demonstrate that a reasonable person would have believed that he was not free to leave if he had responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment"), defendant's objection on Fourth Amendment grounds to Officer Servis's approaching him and asking him for some identification is without merit.

**B.**     **Although Reasonable Suspicion Is  Not Required to Justify An Officer's Questions Concerning Identity, Officer Servis Had Ample Reasonable Suspicion That Defendant Was an Illegal Alien To Warrant His Initial Encounter With Defendant.**

12.     The Fourth Amendment does not require a law enforcement officer who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.  Adams v. Williams, 407 U.S. 143, 145 (1972).  Instead, the law is settled that a police officer may briefly detain a suspect if he has a reasonable articulable suspicion that criminal activity may be afoot.  Terry v. Ohio, 392 U.S. 1 (1968); United States v. Hensley, 469 U.S. 221, 227-29 (1985).  "Under the Fourth Amendment . . . a policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to investigate the circumstances that provoke suspicion."  United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975) (internal quotation marks omitted).  Reasonable suspicion is a "commonsensical proposition" that credits the officer's special training and practical experience, United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993), and it is a lesser showing than probable cause.  United States v. Perrin, 45 F.3d 869, 872 (4th Cir. 1995), cert. denied, 115 S.Ct. 2287 (1995).  Even innocent factors considered together can amount to a reasonable suspicion.  United States v. Sokolow, 490 U.S. 1, 9-10 (1989); see also United States v. Arvizu, 534 U.S. 266, 277 (2002).

13.     Notwithstanding that the law does not require an officer to have reasonable suspicion to justify approaching a citizen and requesting some identification, there is ample evidence here that defendant was in the United States illegally to justify Officer Servis's approach of defendant and request for some identification.  Prior to defendant's detention by

police on August 5, 2006, Special Agent Leeper had been actively investigating the fraudulent identity document trade on Columbia Avenue, N.W., and he had information that defendant, who was already known to him, was a principal player in the trade in that area.

14.     On August 5, 2006, Leeper received information from a previously reliable, confidential informant that defendant was actually sitting on a park bench in the 1700 block of Columbia Avenue, wearing white pants, a red shirt, and a dark-colored hat (or he was holding it). Leeper immediately contacted MPD and requested assistance in locating and arresting defendant. In doing so, Leeper passed along the information provided to him by the informant, and he also gave police defendant's full name.

15.     Within a very short time, MPD Officer Servis responded to the 1700 block of Columbia Avenue and immediately observed defendant, who was located in the specific area, and matched the physical and clothing description, that were reported to him.[2]  Upon confirming this specific information, Servis approached defendant and asked him for some identification. Defendant thereupon produced a Mexican driver's license which bore his correct name and, consequently, defendant was detained by police.  Finally, significantly, the encounter with defendant prior to his being detained by police lasted no more than a minute or two.  See United States v. Place, 462 U.S. 696, 709 (1983) (discussing "whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion").  On these facts and circumstances, there can be no question that Officer Servis had much more than a reasonable suspicion that defendant was in violation of the law to justify his approach and request of defendant's identification which led to his detention.

---

[2] Officer Servis knew that defendant was an Hispanic man, based at least in part on the name provided to him by Special Agent Leeper.

16.     Defendant's principal argument in support of his motion to suppress is that police "did not have an articulable suspicion that [he] was engaged in criminal activity to justify an arrest or search," because "he was not engaged in any criminal conduct known to the law enforcement officials who approached him."  <u>See</u> Defendant's Motion at 1-2.  Defendant's assertion completely misses the mark.  In this case, it is the mere fact of defendant's presence in the United States, after his having previously been deported from the country (twice), that constitutes his illegal conduct.  Thus, it was unnecessary for police to have observed defendant engaged  in any additional criminal conduct because his mere presence in this country was a crime.  Once defendant provided his correct name, this information confirmed Officer Servis's suspicion that defendant was an illegal alien, and Servis therefore could arrest him.

**B.      Once Police Determined Defendant's Name, They Had Probable Cause to Arrest Him.**

17.     "Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed."  <u>Draper v. United States</u>, 358 U.S. 307, 313 (1959) (quoting <u>Carroll v. United States</u>, 267 U.S. 132, 162 (1925).; <u>accord</u> <u>United States v. Caroline</u>, 792 F.2d 197, 201 (D.C. 1986) ("Probable cause for a search exists where 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)).  In determining whether there was probable cause to make an arrest or conduct a search, a court should evaluate the "totality of the circumstances" surrounding the search or arrest.  <u>Gates</u>, 462 U.S. at 230.

18.     A "totality" analysis is particularly suited to these determinations because they

"are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act." Id. (internal quotation marks omitted). Probable cause requires finding "only the probability, . . . not a prima facie showing, of criminal activity." Id. (internal quotation marks omitted); accord United States v. Davis, 617 F.2d 677, 692 (D.C. Cir. 1979), cert. denied, 445 U.S. 967 (1980).

19.    Information provided by a reliable informant and corroborated by independent police investigation can be sufficient to establish probable cause. Draper, 358 U.S. at 314. Factors that are "highly relevant" to determining an informant's reliability include whether his identity is known, his history of veracity, and the basis of his current knowledge. Alabama v. White, 469 U.S. 325, 328 (1990). An informant's veracity, reliability, and basis of knowledge are all highly relevant, "intertwined" factors that are part of the probable cause mix. See Gates, 462 U.S. at 230, 233. Such tips come "in many shapes and sizes from many different types of persons," and a deficiency with respect to one factor (e.g., an informant's "basis of knowledge" of the relevant facts) "may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other [e.g., the informant's credibility or past veracity], or by some other indicia of reliability." Id. at 233; see also United States v. Laws, 808 F.2d 92, 96 (D.C. Cir. 1986) (informant's veracity and basis of knowledge are connected elements and relevant considerations in the "totality" analysis).

20.    In the case at bar, the totality of circumstances clearly support law enforcement officers' belief that they had probable cause to arrest defendant without a warrant. First, the confidential informant here was reliable. A hearing held on this matter will reveal that Special Agent Leeper and his partner, Heath Simon, had worked with the informant for over a year, and that on numerous prior occasions the informant had provided Leeper and Simon with information

that was later corroborated in subsequent investigations through the arrests of illegal aliens; and

that on all the occasions that the informant provided such information, it never gave information

that later turned out to be incorrect.  The District of Columbia Circuit Court of Appeals has held

that an informant's "track record" is one key indicium of his veracity and credibility.  United

States v. Warren, 42 F.3d 647, 652 (D.C. Cir. 1994); see also United States v. Bruner, 675 F.2d

1278, 1296 (D.C. Cir. 1981) (an assertion that a source had previously given correct information

concerning narcotics violators is entitled to weight as a factor establishing probable cause).

      21.     Second, the confidential informant's information was specific and independently

corroborated by police.  See Laws, 808 F.2d at 100 (an informant's reliability "may also be

established by external circumstances tending to show that information he supplies deserves

credit," something that "is often accomplished through independent verification of particular

aspects of the informant's story").  Here, the confidential informant provided detailed

information regarding defendant's full name (Gustavo Villanuevo-Sotelo), his clothing (white

pants, red shirt, and dark hat either worn on his head or held in his hand), and his location (1700

block of Columbia Avenue, N.W., sitting on a bench).  Upon receiving this information, Officer

Servis quickly acted on it.  Within minutes, Officer Servis arrived in the area and immediately

corroborated the information provided to him – first, he saw that defendant was an Hispanic man,

which confirmed the physical description of the person he was seeking; second, he observed that

defendant's clothing precisely matched that description that was given to him; and, third, he

found that defendant was at the reported location (sitting on one of just two or three park benches

in the area), at the reported time.

      22.     The specificity of the informant's information, along with Officer Servis's

corroboration, clearly supported the reliability of the informant's tip.  Having corroborated all of

the informant's information, Officer Servis could reasonably conclude that the informant's information that the person before him was in fact Gustavo Villanueva-Sotello, an illegal alien, was also correct.  See Gates, 462 U.S. at 244 ("Because an informant is right about some things, he is more probably right about other facts, including the claim regarding [a defendant's] criminal activity.").   Yet, it was only after Office Servis was able to confirm all of this specific information that he approached defendant, requested identification, and discovered that defendant's name was in fact Gustavo Villanuevo-Sotelo.  Once this additional layer of information was corroborated, Officer Servis was able to place defendant under arrest.  Finally, the subsequent search of defendant's person and recovery of fraudulent documents and money was lawful as a search incident to arrest.  See United States v. Holmes, 385 F.3d 786 (D.C. Cir. 2004); Wesley v. United States, 293 F.3d 541 (D.C. Cir. 2002).

WHEREFORE, for the reasons stated above, the United States respectfully submits that defendant's Motion to Suppress Physical Evidence should be denied.

Respectfully submitted,

By:    _____"/s/"_____

JEFFREY A. TAYLOR
United States Attorney
Bar No. 498610

By:    _____"/s/"_____

Donnell W. Turner
Assistant United States Attorney
Maryland Bar
555 4th Street, N.W.  # 4235
Washington, DC 20004
Tel. (202) 305-1419
Fax: (202) 616-3287

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Government's Opposition to Defendant's Motion to Suppress Tangible Evidence was served by First Class United States mail, postage prepaid, on counsel of record for the defendant, Steven R. Kiersh, at 717 D Street, N.W., Suite 400, Washington, D.C.  20004, this 15th day of December, 2006.

_____"/s/"_____

Donnell W. Turner
Assistant United States Attorney