# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 2, 2007        Decided February 15, 2008

No. 07-3055

UNITED STATES OF AMERICA,
APPELLANT

v.

GUSTAVO VILLANUEVA-SOTELO,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 06cr00271-01)

———

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    FEB 1 5 2008

CLERK

FILED
JUL - 9 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*Ellen Chubin Epstein*, Assistant U.S. Attorney, argued the cause for appellant. With her on the briefs were *Jeffrey A. Taylor*, U.S. Attorney, *Roy W. McLeese, III*, *Elizabeth Trosman*, and *Frederick W. Yette*, Assistant U.S. Attorneys.

*Steven R. Kiersh*, appointed by the court, argued the cause and filed the brief for appellee.

Before: HENDERSON and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

2

Dissenting opinion filed by *Circuit Judge* HENDERSON.

TATEL, *Circuit Judge*: The federal "[a]ggravated identity theft" statute imposes two additional years of imprisonment on any person who during the commission of an enumerated felony "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A(a)(1). The question before us is this: to obtain a conviction under section 1028A(a)(1), must the government prove the defendant *knew* the "means of identification" he "transfer[red], possesse[d], or use[d]" actually belonged to "another person," or is it sufficient for the government to show that the means of identification *happened* to belong to another person? Based on the statute's text, purpose, and legislative history—and mindful that the rule of lenity comes into play when, after resort to the traditional tools of statutory interpretation, reasonable doubt remains as to the statute's meaning—we hold that section 1028A(a)(1)'s mens rea requirement extends to the phrase "of another person," meaning that the government must prove the defendant actually knew the identification in question belonged to someone else.

## I.

Defendant Gustavo Villanueva-Sotelo, a Mexican national, has entered the United States illegally three times and has been deported twice. In August 2006, District of Columbia Metropolitan Police approached Villanueva-Sotelo and asked him for identification. Villanueva-Sotelo presented the officers with what appeared to be a permanent resident card—an official document issued by the Department of Homeland Security proving its holder is authorized to stay or work in the United States. Villanueva-Sotelo's card displayed his own name and photograph, listed Mexico as his country of origin, and included an alien registration number. Villanueva-

3

Sotelo admits he knew the card was a fake. Although the government can prove that the alien registration number displayed on the card belonged to another individual, it concedes—critically for this case—that it lacks any evidence that Villanueva-Sotelo actually knew this.

The government charged Villanueva-Sotelo with unlawful entry of a removed alien in violation of 8 U.S.C. § 1326(a) and (b)(1) (count one), possession of a fraudulent document prescribed for authorized stay or employment in the United States in violation of 18 U.S.C. § 1546(a) (count two), and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) (count three). In full, the identity theft statute reads: "Whoever, during and in relation to any felony violation enumerated in subsection (c), *knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person* shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." *Id.* (emphasis added).

Villanueva-Sotelo pled guilty to the first two counts but moved to dismiss count three, the aggravated identity theft charge, arguing that section 1028A(a)(1) requires the government to prove he actually knew the alien registration number belonged to another person. Agreeing with the defendant, Judge Friedman held that the word "knowingly" in section 1028A(a)(1) must "modify both the verbs and the object, that is, 'means of identification of another person.'" Hr'g Tr. at 50 (Apr. 4, 2007). In reaching this conclusion, the Judge found the following exchange with the prosecutor particularly illuminating:

> [PROSECUTOR]: [I]t is stealing in the sense that if I make up a number and it belongs to someone else, I have taken that person's

4

number that was rightfully assigned by a U.S.
agency.

THE COURT: If you make up the number?

[PROSECUTOR]: Yes. If I—

THE COURT: What if you make up a number
that doesn't belong to anybody?

[PROSECUTOR]: Then you don't charge the
offense, there is no offense because it's not a
means of identification of another person.

THE COURT: So if the defendant picked a
number out of the air and it was [your]
number, he's guilty, but if he picked a number
out of the air and [Immigration and Customs
Enforcement] hasn't assigned it to anybody,
he's not guilty?

[PROSECUTOR]: That's correct.

*Id.* at 15. Unable to conclude that a scenario like this amounts
to identity theft, *see id.* at 48, Judge Friedman granted
Villanueva-Sotelo's motion to dismiss count three.

The government now appeals. Because this case presents
a pure question of statutory interpretation, we review the
district court's decision de novo. *See Butler v. West*, 164 F.3d
634, 639 (D.C. Cir. 1999).

## II.

Our interpretive task begins with the statute's language.
*See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002).

5

We must first "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). If it does, our inquiry ends and we apply the statute's plain language. *See Sigmon Coal*, 534 U.S. at 450. But if we find the statutory language ambiguous, we look beyond the text for other indicia of congressional intent. *See Staples v. United States*, 511 U.S. 600, 605 (1994) ("[D]etermining the mental state required for commission of a federal crime requires 'construction of the statute and . . . inference of the intent of Congress.'" (omission in original) (quoting *United States v. Balint*, 258 U.S. 250, 253 (1922))).

Reduced to its essence, section 1028A(a)(1) reads as follows: "Whoever . . . knowingly . . . uses, without lawful authority, a means of identification of another person shall . . . be sentenced to a term of imprisonment of 2 years." According to the government, this text is unambiguous: the statute's knowledge requirement extends only so far as "means of identification," requiring no proof the defendant knew the identification belonged to "another person." For his part, Villanueva-Sotelo contends the statute is ambiguous and that the provision's title, purpose, and legislative history reveal Congress's intent to extend the mens rea requirement throughout the entire sentence, namely all the way to "of another person." We agree with the defendant. Although the government's interpretation is plausible, nothing suggests it represents the only possible—or even the most plausible— reading of section 1028A(a)(1). *See McCreary v. Offner*, 172 F.3d 76, 82 (D.C. Cir. 1999) (finding a statute ambiguous because it was "reasonably susceptible to more than one meaning"); *see also Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 4 (D.C. Cir. 1999) ("Although the inference petitioner would draw as to the statute's meaning is not by any means unreasonable, it is also not inevitable.").

6

The parties focus on the word "knowingly," debating whether that adverb modifies the phrase "of another person." But a simple diagram of the relevant statutory text readily demonstrates that, from a grammatical point of view, this is not the correct question:



The word "knowingly" technically modifies only the verb that follows it ("uses"). It *modifies* neither the direct object ("means") nor the two prepositional phrases that follow ("of identification of another person"). *See* ROBERT FUNK ET AL., THE ELEMENTS OF GRAMMAR FOR WRITERS 62 (MacMillan 1991) ("An adverb, in standard English, modifies almost anything except a noun.").

In the end, this grammatical observation is beside the point given that the parties, as well as relevant case law interpreting similarly structured statutes (cases we discuss below), are best understood as using the word "modify" more loosely, equating it with words such as "apply," "extend," or "attach." *See, e.g., United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994); *Liparota v. United States*, 471 U.S. 419, 424-25 n.7 (1985); *United States v. Nofziger*, 878 F.2d 442, 446 (D.C. Cir. 1989). Thus, framing the question in terms of statutory interpretation, we ask how far section

7

1028A(a)(1)'s mens rea requirement—"knowingly"—reaches in the statute.

That question requires us to focus on the statute's direct object, "means." "Means" is modified by the prepositional phrase "of identification," which, in turn, is modified by a second prepositional phrase, "of another person." As the government concedes, the mens rea requirement must extend at least to the direct object's principal modifier, "of identification." Were it otherwise, a person could be convicted for "knowingly us[ing] or transfer[ring]," without lawful authority, anything at all that happened to contain a means of identification. As one district court explained:

> If during a bank fraud conspiracy, I hand a defendant a sealed envelope asking her to transfer it and its contents to another and she knowingly does so, she has knowingly transferred the envelope and its contents. But if she believes my statement that the envelope contains only a birthday card when in fact it contains a forged social security card, the government surely would not contend that she should receive the enhanced penalty.

*United States v. Godin*, 476 F. Supp. 2d 1, 2 (D. Me. 2007). And it goes without saying that the mens rea requirement must also reach beyond the bare direct object "means" to its first modifying phrase "of identification," lest the sentence become gibberish: "knowingly using a means" means nothing.

But what of the second and crucial prepositional phrase "of another person"? Does section 1028A(a)(1)'s mens rea requirement apply to it as well? The government is certainly

8

correct that the statute's knowledge requirement might apply only to the direct object's first prepositional phrase, thereby criminalizing "knowingly transfer[ing], possess[ing], or us[ing] . . . a means of identification" that happens to belong to another. Indeed, as the dissent points out, Congress knows how to draft a statute that unambiguously extends a mens rea requirement to various elements in the statutory text. *See* Dissenting Op. at 12 (citing 18 U.S.C. § 1546(a)). But with regard to section 1028A(a)(1), the defendant's view—that the statute's mens rea requirement extends all the way to "of another person"—is at least equally plausible. Neither the government nor the dissent offers a convincing reason, nor are we aware of one, demanding the statute's mens rea requirement halt after "of identification" rather than proceed to "of another person." Indeed, the Model Penal Code adopts as a general principle of construction a rule under which, absent evidence to the contrary, the mens rea requirement encompasses all material elements of an offense. *See* MODEL PENAL CODE § 2.02(4) (1985) ("When the law defining an offense prescribes the kind of culpability that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose plainly appears."); *see also X-Citement Video*, 513 U.S. at 79 (Stevens, J., concurring) ("[T]he normal, commonsense reading of a subsection of a criminal statute introduced by the word 'knowingly' is to treat that adverb as modifying each of the elements of the offense identified in the remainder of the subsection.").

A simple rewrite of the statute further underscores the plausibility of Villanueva-Sotelo's interpretation. Suppose section 1028A(a)(1) had read, "whoever knowingly uses . . . another person's means of identification." Written that way, the statute would most plausibly require proof that the

9

defendant actually knew the means of identification used belonged to someone else, and as government counsel agreed at oral argument, the phrases "means of identification of another person" and "another person's means of identification" carry precisely the same meaning. Oral Arg. at 5:13-:33, 7:49-8:02. True, Congress used a cumbersome prepositional phrase rather than the more elegant possessive form, but we see nothing of significance in that syntactic choice.

Two additional factors reinforce our conclusion that section 1028A(a)(1) is ambiguous. First, the next provision of the same statute, section 1028A(a)(2), increases penalties for identity theft perpetrated in connection with "[t]errorism offense[s]." 18 U.S.C. § 1028A(a)(2). Structured nearly identically to subsection (a)(1), that provision reads:

> Whoever, during and in relation to any felony violation enumerated in section 2332b(g)(5)(B), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person *or a false identification document* shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 5 years.

*Id.* (emphasis added). The government concedes that section 1028A(a)(2)'s knowledge requirement must apply to the whole phrase "false identification document." Oral Arg. at 8:43-:58, 9:30-:48. Thus, as a matter of pure textual distance, the mens rea requirement travels farther in subsection (a)(2) than the government claims possible in subsection (a)(1). Indeed, under the government's interpretation, "knowingly" must skip over the contested phrase "of another person" and

10

then, suddenly resuming its influence, apply to "false identification document." Moreover, if Congress had intended section 1028A(a)(2)'s mens rea requirement to reach beyond "identification document" to embrace the fact of its falsity, it seems equally likely that Congress intended a parallel application regarding the phrase "means of identification of another person"—precisely the same language at issue in section 1028A(a)(1). As the Supreme Court has observed, "it is difficult to conclude that the word 'knowingly' modifies one of the elements in [a] subsection[] . . . but not the other." *X-Citement Video*, 513 U.S. at 77-78. And if "knowingly transfers, possesses, or uses" acts upon the direct object and its modifiers in subsection (a)(2), we think it quite reasonable to conclude that it could do the same in subsection (a)(1).

Second, we have previously found similarly structured statutes to be ambiguous. For instance, in *United States v. Nofziger*, 878 F.2d 442, we considered a statute prohibiting former government employees from lobbying their former agencies. In relevant part, that statute prohibited covered employees from "*knowingly* . . . with the intent to influence, mak[ing] any oral or written communication . . . to the department or agency in which he served . . . in connection with any . . . particular matter . . . in which such department or agency has a *direct and substantial interest*." 18 U.S.C. § 207(c) (1982) (emphasis added). There, as here, "[t]he principal dispute in th[e] case [was] over the reach of the word 'knowingly.'" *Nofziger*, 878 F.2d at 444. While Nofziger, a former White House advisor convicted under this statute for improperly communicating with his former employer, argued that the government had to "show[] that he had knowledge that the agency had a 'direct or substantial' interest in the matter," the government urged a more limited application of the statute's mens rea requirement. *Id.* at 446.

11

Ultimately agreeing with Nofziger and observing that the statute was "hardly a model of clarity," *id.* at 445 (citation omitted), we found the provision ambiguous, stating that "'knowingly' can reasonably be read to apply to all elements of the . . . offense, including the 'direct or substantial interest' element." *Id.* at 447; *see also id.* ("[T]he . . . language . . . clearly permits the inference that 'knowingly' attaches to all elements of the . . . offense."). So too here. Text alone cannot resolve this case because "knowingly" may "apply to all elements of the . . . offense," *id.*, including the requirement that the identification used belong to "another person."

Likewise, in *United States v. Chin*, 981 F.2d 1275 (D.C. Cir. 1992), we confronted a statute making it a crime for any adult "knowingly and intentionally" to "employ, hire, use, persuade, induce, entice, or coerce, a person under eighteen years of age to assist in avoiding detection or apprehension for any [listed federal drug offense]." 21 U.S.C. § 861(a)(2). Again observing that the statute was "not a model of meticulous drafting," we explained that "[o]ne *cannot tell from the words alone* whether the person's juvenile status must be known . . . or whether it suffices that the act of using a person to avoid detection be 'knowing[] and intentional[].'" *Chin*, 981 F.2d at 1279 (emphasis added) (second and third alterations in original). Here, faced with similarly ambiguous text, we "cannot tell from the words alone," *id.*, whether section 1028A(a)(1) requires the defendant to know the means of identification he used belonged to another person, or whether it suffices that the act of "transfer[ring], possess[ing], or us[ing] . . . a means of identification" be done "knowingly." 18 U.S.C. § 1028A(a)(1). To be sure, in *Chin* we ultimately held that the statute required no proof the defendant knew the person used was a minor, but we did so only after investigating the statute's purpose and finding Congress's intent to protect minors as a class "fairly implied."

12

981 F.2d at 1280. Although the government now urges us to follow *Chin* by refusing to extend "knowingly" throughout section 1028A(a)(1), it ignores *Chin*'s holding that text alone failed to resolve the case.

The Supreme Court has also provided useful guidance on how to interpret statutes constructed like section 1028A(a)(1). In *Liparota v. United States*, 471 U.S. 419, the Court wrestled with a federal food stamp statute that read: "[W]hoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [law]" is subject to a fine and imprisonment. 7 U.S.C. § 2024(b)(1) (1982). The parties disputed whether the statute's knowledge requirement applied to the phrase "in any manner not authorized by [law]." Text alone, the Court explained, provided no answer:

> Congress has not explicitly spelled out the mental state required. Although Congress certainly intended by use of the word "knowingly" to require *some* mental state with respect to *some* element of the crime defined in [the statute], the interpretations proffered by both parties accord with congressional intent to this extent. Beyond this, the words themselves provide little guidance. *Either interpretation would accord with ordinary usage.*

*Id.* at 424 (third emphasis added). By way of analogy, the Court made the same point in a footnote:

> Still further difficulty arises from the ambiguity which frequently exists concerning what the words or phrases in question modify. What, for instance, does "knowingly" modify

13

in a sentence from a "blue sky" law criminal
statute punishing one who "knowingly sells a
security without a permit" from the securities
commissioner? To be guilty must the seller of
a security without a permit know only that
what he is doing constitutes a sale, or must he
also know that the thing he sells is a security,
or must he also know that he has no permit to
sell the security he sells? *As a matter of
grammar the statute is ambiguous; it is not at
all clear how far down the sentence the word
"knowingly" is intended to travel—whether it
modifies "sells," or "sells a security," or
"sells a security without a permit."*

*Id.* at 424-25 n.7 (emphasis added) (quoting W. LaFave & A.
Scott, Criminal Law § 27 (1972)); *see also Arthur
Andersen LLP v. United States*, 544 U.S. 696, 705 (2005)
("We have recognized with regard to similar statutory
language that the mens rea at least applies to the acts that
immediately follow, *if not to other elements down the
statutory chain.*" (emphasis added)).

As in the statutes at issue in *Liparota, Chin,* and *Nofziger,*
the word "knowingly" appears in section 1028A(a)(1) before
a verb or series of verbs, a direct object, and at least one other
term further describing that object. Here, as in those cases,
the government and defendant contest the knowledge
requirement's reach. And here, as in those cases, "either
interpretation would accord with ordinary usage." *Liparota,*
471 F.2d at 424.

Ignoring the Supreme Court's clear finding that text
alone cannot resolve statutes structured this way, the
government and dissent argue that *Liparota,* reinforced by *X-*

14

*Citement Video*, demonstrates that the Court will extend a knowledge requirement only when failing to do so could criminalize otherwise innocent conduct—a concern not present here because section 1028A(a)(1) requires a predicate felony offense. *See* Dissenting Op. at 14-19. True, the Court has found it "particularly appropriate" to extend a mens rea requirement when failure to do so would result in a statute criminalizing nonculpable conduct. *Arthur Andersen*, 544 U.S. at 703; *Liparota*, 471 U.S. at 426; *see also Staples*, 511 U.S. at 610 ("[We have taken] particular care . . . to avoid construing a statute to dispense with mens rea where doing so would 'criminalize a broad range of apparently innocent conduct.'" (quoting *Liparota*, 471 U.S. at 426)). But the Court has never held that avoiding such a result is the only reason to do so. Thus, while "[t]he presumption in favor of scienter *requires* a court to read into a statute only that mens rea which is necessary to separate wrongful conduct from 'otherwise innocent conduct,'" *Carter v. United States*, 530 U.S. 255, 269 (2000) (emphasis added) (quoting *X-Citement Video*, 513 U.S. at 72), courts *may* extend a mens rea requirement when ordinary tools of statutory interpretation—text, structure, purpose, and legislative history—compel that result. Accordingly, *Liparota*'s concern with criminalizing nonculpable conduct has no bearing on the threshold issue before us—whether section 1028A(a)(1) is ambiguous.

In answering that question in the affirmative, we acknowledge, as the government emphasizes, that the Fourth Circuit reached the opposite conclusion in *United States v. Montejo*, 442 F.3d 213 (4th Cir. 2006), *cert. denied*, 127 S. Ct. 366 (2007). Finding section 1028A(a)(1) unambiguous, our neighboring circuit reasoned that "as a matter of common usage, 'knowingly' does not modify the entire lengthy predicate that follows it." *Id.* at 215. Although the Eleventh Circuit, along with several district courts, has adopted this

15

interpretation, *see, e.g., United States v. Hurtado*, 508 F.3d 603 (11th Cir. 2007) (per curiam); *United States v. Godin*, 489 F. Supp. 2d 118 (D. Me. 2007); *United States v. Contreras-Macedas*, 437 F. Supp. 2d 69 (D.D.C. 2006), other district courts have found section 1028A(a)(1) ambiguous and embraced the defendant's view. *See United States v. Salazar-Montero*, ___ F. Supp. 2d ___, No. CR 07-2020-MWB, 2007 WL 3102096 (N.D. Iowa Oct. 25, 2007); *United States v. Beachem*, 399 F. Supp. 2d 1156 (W.D. Wash. 2005).

We respectfully disagree with *Montejo*. Although the court there correctly concluded that the adverb "knowingly" modifies only the verbs "transfers, possesses, [and] uses," *see* 442 F.3d at 215 (alteration in original), that grammatical observation, as explained above, fails to resolve the key question, namely, how far does the statute's mens rea requirement extend? *Montejo*'s observation that "knowingly" must rest "adjacent to the words it modifies, as close as it can get" provides no help either. *Id.* at 216. As one district court interpreting section 1028A(a)(1) observed, "'knowingly' has been placed as close as possible to the entire, indivisible predicate: 'transfers, possesses, or uses, without lawful authority, a means of identification of another person.'" *Salazar-Montero*, 2007 WL 3102096, at *9. Moreover, *Liparota*'s observation that statutes structured like 1028A(a)(1) are ambiguous "[a]s a matter of grammar," 471 U.S. at 425 n.7, fatally undermines *Montejo*'s reliance on "common usage." 442 F.3d at 215. Indeed, the Fourth Circuit expressly acknowledged that in *Liparota* the Court found both "interpretation[s] of the scope of the term 'knowingly' . . . in accord with common usage." *Id.* at 216.

## III.

Having found section 1028A(a)(1) ambiguous, "we seek guidance in the statutory structure, relevant legislative history,

16

[and] congressional purposes expressed in the [statute]." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 737 (1985). According to the government, the legislative history demonstrates that "Congress intended to criminalize the knowing possession of fraudulent identity documents, even if the defendants lacked the specific knowledge that they possessed a´ real person's means of identification." Appellant's Opening Br. 18. The dissent agrees. *See* Dissenting Op. at 8. Reading the legislative history differently, Villanueva-Sotelo argues that Congress intended to target identity theft and the thieves who perpetrate it, rather than to create a sentencing enhancement for individuals who use fraudulent identifying information belonging purely by happenstance to someone else. Again, we agree with Villanueva-Sotelo.

We begin with section 1028A's title: "[a]ggravated identity theft." *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (citation and internal quotation marks omitted)); *see also Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) ("For interpretive purposes, [the title is] of use only when [it] shed[s] light on some ambiguous word or phrase." (second and third alterations in original) (citation and internal quotation marks omitted)). As that title demonstrates, the statute concerns "theft," i.e., "the felonious taking and removing of personal property *with intent to deprive the rightful owner of it*." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2369 (1993) (emphasis added); *see also* BLACK'S LAW DICTIONARY 1516 (8th ed. 2004) ("The felonious taking and removing of another's personal property with the intent of depriving the true owner of it."). Yet Villanueva-Sotelo, having had no idea that his forged alien registration number belonged to

17

anyone at all, couldn't possibly have had the intent to deprive another person of his or her identity. True, Villanueva-Sotelo had a guilty mind—he knowingly presented a fake permanent resident card to D.C. police officers—but he pled guilty to precisely that charge in the indictment's second count and is being punished accordingly.

Judge Friedman's colloquy with the prosecutor, *see supra* at 3-4, reveals just how far the government's interpretation departs from the statute's focus on "theft." As the government argued in the district court and reiterated at oral argument here, a defendant could pick a series of numbers out of the air and win two extra years in prison if those numbers happened to coincide with an assigned identification number, yet escape punishment under section 1028A(a)(1) had he picked a slightly different string of random numbers. *See* Hr'g Tr. at 15, 48. That's not theft. Judge Friedman could not square the government's position with congressional intent, nor can we.

That Congress intended section 1028A(a)(1) to single out thieves—in the traditional sense of the word—for enhanced punishment finds additional support in the statute's legislative history. Frustrated that "many identity thieves receive short terms of imprisonment or probation," H.R. Rep. No. 108-528, at 3 (2004), *reprinted in* 2004 U.S.C.C.A.N. 779, 780, Congress passed section 1028A(a)(1) as part of the Identity Theft Penalty Enhancement Act, Pub. L. No. 108-275, 118 Stat. 831 (2004). The House Judiciary Committee Report accompanying the Act repeatedly emphasizes Congress's intent to target and punish "identity *thieves*" who "*steal* identities to commit terrorist acts, immigration violations, firearms offenses, and other serious crimes." H.R. Rep. No. 108-528, at 3 (emphases added). The report further explains: "The terms 'identity theft' and 'identity fraud' refer to all

18

types of crimes in which someone wrongfully obtains and
uses another person's personal data in some way that involves
fraud or deception, typically for economic or other gain,
including immigration benefits." *Id.* at 4. Although whether
a person who imagines a string of random numbers has
"wrongfully obtain[ed]" personal data is debatable, section
1028A(a)(1)'s legislative history demonstrates that at least for
purposes of this statute, Congress has already answered that
question in the negative. The House Report describes identity
theft in detail, providing a series of examples of how one
"wrongfully obtains" another person's personal data. The
report first describes how "identity thieves" operate,
explaining that they

> obtain[] individuals' personal information for
> misuse not only through "dumpster diving,"
> but also through accessing information that
> was originally collected for an authorized
> purpose. The information is accessed either by
> employees of the company or of a third party
> that is authorized to access the accounts in the
> normal course of business, or by outside
> individuals who hack into computers or steal
> paperwork likely to contain personal
> information.

*Id.* at 4-5. The report then lists a string of cases in which
convicted identity thieves escaped with relatively light
sentences, all of which involved defendants who, unlike
Villanueva-Sotelo, knew the identification they used belonged
to another. Focusing on the immigration context, the report
mentions a case in which a Mexican resident obtained federal
benefits by using "the name and Social Security number of his
former brother-in-law, a U.S. citizen." *Id.* at 6. Other
examples cited include a woman who used her husband's

19

social security number to obtain disability benefits, a health club worker who used a "skimmer" to obtain credit card data from the club's members, and a bank employee who accessed the bank's computer files to obtain customer account information. *Id.* at 5-6. In each of these examples, the thief knew the stolen information belonged to another person—indeed, that was the very essence of the crime.

The floor debate reveals a similar emphasis on theft. Representative Sensenbrenner, the House Judiciary Committee Chair and the bill's floor manager, explained, "This legislation will allow prosecutors to identify identity thieves who steal an identity, sometimes hundreds or even thousands of identities, for purposes of committing one or more crimes." 150 Cong. Rec. H4809 (daily ed. June 23, 2004) (statement of Rep. Sensenbrenner). Representative Carter, the Act's author and lead sponsor, likewise explained that the legislation would "facilitate the prosecution of criminals who steal identities in order to commit felonies," recounting a case in which a "Texas driver's license bureau clerk pleaded guilty to selling ID cards to illegal immigrants using stolen information from immigration papers." *Id.* at H4810 (statement of Rep. Carter). At no point in the legislative record did anyone so much as allude to a situation in which a defendant "wrongfully obtain[ed]" another person's personal information unknowingly, unwittingly, and without intent.

In support of the contrary position—that Congress targeted not just thieves, but also anyone using a false identification document happening to belong to another person—the government directs us to the following language from the House Report:

20

> This section amends Title 18 to provide for a
> mandatory consecutive penalty enhancement
> of 2 years for any individual who knowingly
> transfers, possesses, or uses the means of
> identification of another person in order to
> commit a serious Federal predicate offense
> ( . . . including immigration violations, false
> citizenship crimes, firearms offenses, and other
> serious crimes).

H.R. Rep. No. 108-528, at 10. But as the Supreme Court
stated when confronting similarly unilluminating legislative
history, "[w]e fail to see how this sentence, which merely
parrots the terms of the statute, offers any enlightenment as to
what those terms mean." *Liparota*, 471 U.S. at 430-31 n.13.

As for the long list of examples evincing the statute's
focus on intentional theft, the government and our dissenting
colleague argue that Congress wished to highlight only the
most egregious examples of identity theft without limiting the
statute's reach to those examples. *See* Dissenting Op. at 7.
This point would carry more weight were the list the only
evidence of congressional intent. But it isn't. Viewing the
list in combination with the statute's title and the legislative
record as a whole, we think it clear that Congress never
intended its "aggravated identity theft" statute to reach
conduct like Villanueva-Sotelo's.

Next, pointing to some of the same legislative history
recounted above, the government and dissent contend that
Congress desired to make it easier for prosecutors "to convict
identity thieves" and to enhance their punishments
accordingly. H.R. Rep. No. 108-528, at 10; Dissenting Op. at
9. We agree, but that begs the question before us: did
Congress consider a defendant like Villanueva-Sotelo to be an

21

identity thief subject to prosecution under this statute? All of
the legislative history the government cites presupposes the
answer to that question.

Finally, the government urges us to disregard the "brief"
legislative discussion surrounding section 1028A(a)(1),
Appellant's Opening Br. 18, and to look instead to section
1028(a)(7), a nearby provision amended at the same time
Congress passed section 1028A(a)(1). *See* 18 U.S.C. §
1028(a)(7) ("Whoever . . . knowingly transfers, possesses, or
uses, without lawful authority, a means of identification of
another person with the intent to commit, or to aid or abet, or
in connection with, any unlawful activity that constitutes a
violation of Federal law . . . shall be punished as provided
. . . ."). Because we find plenty in section 1028A's legislative
history revealing congressional intent regarding that
provision, we see little reason to look to other statutes for
guidance. In any event, the legislative discussion surrounding
section 1028(a)(7) offers the government no help. Congress
amended section 1028(a)(7) to ease the prosecution of identity
thieves who intend to use "another person's means of
identification" (note the use of the possessive form, *see supra*
at 8-9) to commit a felony, but have not yet actually done so.
*See* H.R. Rep. No. 108-528, at 10-11. This tells us nothing
about whether conduct like Villanueva-Sotelo's amounts to
"identity theft" in the first place. Moreover, according to the
House Report, the amendment targeted those "who knowingly
facilitate the operations of an identity-theft ring by stealing,
hacking, or otherwise gathering in an unauthorized way other
people's means of identification, but who may deny that they
had the specific intent to engage in a particular fraud
scheme." *Id.* at 11. Far removed from the issue we face here,
that scenario underscores the extent to which Congress
intended to single out and punish those who knowingly steal
others' identities.

22

In short, there is a salient difference between theft and accidental misappropriation. While Villanueva-Sotelo surely misappropriated someone else's alien registration number, no evidence shows he stole it in any meaningful sense. As the first district court to interpret this statute observed, and as the government concedes, "it is odd—and borders on the absurd—to call what [the defendant] did 'theft.'" *United States v. Montejo*, 353 F. Supp. 2d 643, 654 (E.D. Va. 2005), *aff'd*, 442 F.3d 213; *see also No Need to Show ID Theft for an ID Theft Conviction*, 30 NAT'L L.J., Dec. 3, 2007, at 14 (describing the Eleventh Circuit's decision in *United States v. Hurtado*, 508 F.3d 603). But "theft" is precisely what Congress targeted when it passed section 1028A(a)(1). Because Congress intended to express "the moral condemnation of the community," *United States v. Bass*, 404 U.S. 336, 348 (1971), by enhancing penalties for thieves who steal identities, we hold that section 1028A(a)(1)'s mens rea requirement extends to the "[a]ggravated identity theft" statute's defining element—that the means of identification used belongs to another person.

Even if we harbored any doubt about this—that is, were we unable to find "an unambiguous intent on the part of Congress"—we would "turn to the rule of lenity to resolve the dispute." *United States v. West*, 393 F.3d 1302, 1311 (D.C. Cir. 2005); *see also Moskal v. United States*, 498 U.S. 103, 108 (1990) ("[W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute." (quoting *Bifulco v. United States*, 447 U.S. 381, 387 (1980))). Although "[t]he rule of lenity is not invoked by a grammatical possibility" and "does not apply if the ambiguous reading relied on is an implausible reading of the

23

congressional purpose," *Caron v. United States*, 524 U.S.
308, 316 (1998), the defendant's reading is quite plausible.
Thus, even if the legislative history failed to resolve the
statute's ambiguity, the rule of lenity would forbid us from
"interpret[ing] a federal criminal statute so as to increase the
penalty that it places on an individual when such an
interpretation can be based on no more than a guess as to what
Congress intended." *Ladner v. United States*, 358 U.S. 169,
178 (1958).

## IV.

We have several additional reactions to the dissent. To
begin with, its view of the statute is not entirely clear. The
dissent first seems to agree that section 1028A(a)(1) is
ambiguous, relying on legislative history to discern the
statute's meaning. *See* Dissenting Op. at 4-10. Elsewhere,
however, the dissent concludes that the statute's text is clear,
making resort to legislative history and congressional intent
unnecessary. *See id.* at 11-12.

The dissent accuses us of grafting a common-law
definition of theft onto the statute when what is required is
"construction of the statute and . . . inference of the intent of
Congress." *Id.* at 5 (quoting *Staples*, 511 U.S. at 605). But as
our discussion indicates, *see supra* at 15-22, we have done
just what the dissent urges: construed the statute and inferred
Congress's intent using the everyday definition of "theft"—as
found in section 1028A's title and throughout its legislative
history—as but one tool among others.

The dissent next points to the same House Report
language we do, *see supra* at 17-18, namely that "[t]he terms
'identity theft' and 'identity fraud' refer to all types of crimes
in which someone wrongfully obtains and uses another
person's personal data in some way that involves fraud or

24

deception." H.R. Rep. No. 108-528, at 4. According to the dissent, this sentence, particularly its reference to "identity fraud," means that "identity 'theft'" must "be read generically." Dissenting Op. at 6. Given the legislative record's overwhelming number of references to "theft," "thieves," and "stealing," plus the statute's title and the Judiciary Committee's many citations to examples of knowing theft, the report's passing references to "identity fraud" hardly support a conclusion that Congress clearly intended to impose two additional years of punishment on a defendant who happens to pick a number that turns out to belong to someone else rather than one assigned to no one. In any case, unlike the dissent, we are prepared to acknowledge that although the vast weight of the legislative history supports our interpretation, some bits of it arguably cut the other way—namely, the evidence the dissent cites in support of its claim that "a primary purpose of the statute was to" ensure "that the punishment more closely fits the harm the crime causes its victim." *See* Dissenting Op. at 8 & n.9. This concession, however, merely reinforces the need for the rule of lenity to resolve any remaining ambiguities, for "where text, structure, and history fail to establish that the Government's position is unambiguously correct[,] we apply the rule of lenity and resolve the ambiguity in [the defendant]'s favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994).

The dissent cites a series of cases in which defendants engaged in otherwise culpable conduct were required to "ascertain at [their] peril whether [their actions] c[a]me[] within the inhibition of the statute." Dissenting Op. at 18 (quoting *United States v. Freed*, 401 U.S. 601, 609 (1971)). Unlike in those cases, however, here we have evidence that Congress intended to limit section 1028A(a)(1) to theft, and

25

we are bound to interpret the statute in light of that expressed intent.

Next, the dissent points to 18 U.S.C. § 1546(a), which provides that "[w]hoever *knowingly* . . . uses . . . [an] alien registration receipt card . . *knowing it to be forged* . . . [s]hall be fined under this title or imprisoned." *Id.* (emphasis added). Reading this statute *in pari materia* with section 1028A(a)(1), which contains no similar repetition of the knowledge requirement, the dissent concludes that Congress could not have intended section 1028A(a)(1) to require a showing that the defendant knew the means of identification used belonged to another person. *See* Dissenting Op. at 12-13 & n.12. Even assuming the *in pari materia* doctrine applies here, sections 1546(a) and 1028A(a)(1) are easily harmonized when read in tandem: defendants who use a false alien registration number are punished under the former statute (as was Villanueva-Sotelo), while those who know that number belongs to someone else receive two additional years under the latter.

In any event, we doubt whether *in pari materia* applies to these statutes. As the very treatise cited by our dissenting colleague explains, courts often ask four questions when deciding if statutes are similar enough to justify reading them *in pari materia.* The answers to all four questions counsel against applying the canon here. First, were "the two statutes . . . contained in the same legislative act"? 2B NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 51:3 (6th ed. 2000 & Supp. 2007-2008). Here, they weren't. Second, do the two statutes require "the same elements of proof"? *Id.* Here, as the dissent emphasizes, they don't. *See* Dissenting Op. at 14. Third, are the penalties the same for both statutes? 2B SINGER, *supra,* § 51:3. Here, they're not. And finally, were the two statutes "obviously designed to serve the same purpose and objective"? *Id.* Answering this last question

26

requires a bit more explanation. As the dissent points out, section 1028A(c)(7), which lists the many predicate offenses triggering the aggravated identity theft statute, incorporates by reference section 1546(a), and both statutes involve "possession of a false means of identification." Dissenting Op. at 13 n.12. True enough, but section 1028A references as predicate offenses a myriad of other federal statutes whose subject matter includes such disparate topics as immigration, social security, embezzlement of public funds, visas, and firearms. *See* 18 U.S.C. § 1028A(c) (listing predicate felony offenses). We think it stretches the *in pari materia* canon beyond reason to apply it to such a wide swath of the United States Code. As for the dissent's observation that sections 1546(a) and 1028A share the same subject matter, "[c]haracterization of the object or purpose is more important than characterization of subject matter in determining whether different statutes are closely enough related to justify interpreting one in light of the other." 2B SINGER, *supra*, § 51:3. Here, the dissent claims that in passing the Identity Theft Penalty Enhancement Act, Congress's "central concern [was] the damage caused by the wrongful use of another person's identity." Dissenting Op. at 8 n.9. That purpose, it goes without saying, differs from the one that animated section 1546(a)—a statute Congress first passed in its current form in 1948, long before "identity theft" entered the criminal lexicon or captured Congress's attention a half-century later. *See United States v. Campos-Serrano*, 430 F.2d 173, 175 (7th Cir. 1970) (recounting the legislative history of 18 U.S.C. § 1546); *see also* Identity Theft and Assumption Deterrence Act of 1998, Pub. L. No. 105-318, 112 Stat. 3007 (1998) (amending 18 U.S.C. § 1028 to include a section on identity theft).

Of greater relevance to this case is a related canon of statutory construction: the "general principle . . . that when

27

'Congress includes particular language *in one section of a statute but omits it in another section of the same Act*, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Sigmon Coal*, 534 U.S. at 452 (emphasis added) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). As we noted above, *see supra* at 9-10, subsection 1028A(a)(2)—the terrorism offense provision—makes it a crime knowingly to use "a means of identification of another person *or a false identification document*," *id.* (emphasis added), while subsection (a)(1)—the general offense provision—never mentions "false identification document[s]." Had Congress parroted subsection (a)(2)'s "false identification document" language in subsection (a)(1), Villanueva-Sotelo's guilt would be plain. But Congress omitted that language for the two-year "general" offense enhancement while including it for the five-year "terrorism offense" enhancement—a decision that makes eminent sense given Congress's heightened concern with the terrorist threat facing our country. *See* H.R. Rep. No. 108-528, at 4 (explaining that "terrorist organizations increasingly turn to stolen identities to hide themselves from law enforcement"). We see no reason to read subsection (a)(2)'s language into subsection (a)(1) when Congress clearly could have placed it there itself.

After concluding that "dueling canons of statutory construction" might fail to resolve the statute's inherent ambiguity, the dissent appeals to "common sense" as an interpretive aide. Dissenting Op. at 15. First off, there is no duel: as we just explained, the canon the dissent cites is either inapplicable or supports our interpretation. More to the point, although common sense certainly plays a role in statutory construction, common sense does not excuse us from engaging in the thorny task of determining what Congress intended when it passed a statute. And here, in any event, to

28

return once more to Judge Friedman's hypothetical, common sense tells us that a defendant ought not receive two additional years of incarceration for picking one random number rather than another—unless, of course, Congress has made clear that he should.   Put another way, it's only common sense to conclude that conviction under an identity theft statute requires actual theft.

Finally, reproducing a troubling news report from 2006— which was not before Congress when it passed the Identity Theft Penalty Enhancement Act two years earlier—showing how one victim's social security number was used by eighty-one different people across the country, *see* Dissenting Op. at 10 n.11, the dissent wonders if Congress really could have intended to punish those individuals who knew they had stolen a real person's number more severely than those who did not.   The short answer to that question is yes.   We see nothing unfathomable about Congress singling out certain morally culpable conduct for enhanced punishment, and section 1028A(a)(1)'s text, title, and legislative history reveal that Congress did precisely that.   And again, even if the dissent's reading is plausible, it is hardly inescapable—which leads us back to the rule of lenity.   When and if Congress considers cases like the one described in the 2006 news article, it may well decide to extend the "[a]ggravated identity theft" statute's reach, or to enhance the penalty still further. But that's a decision for Congress, not this court.

## V.

Two final points.   First, we doubt that our interpretation of section 1028A(a)(1) will saddle the government with a burden it cannot meet.   In each of the examples Congress cited, *see supra* at 18-19—as in most run-of-the-mill identity theft cases—proving the defendant knew the stolen identification belonged to another person should present no

29

major obstacle, as such knowledge will often be demonstrated by the circumstances of the case. For instance, when an individual obtains personal information by trolling through the victim's garbage or by improperly viewing files to which the perpetrator gains access, he obviously knows the information belongs to someone else. And when an identity thief establishes credit, conducts transactions, or secures benefits in the victim's name, the crime would make little sense if the information at issue belonged to no one. In that sense, this case differs from *Chin*, in which we found it "implausible that Congress would have placed on the prosecution the often impossible burden of proving, beyond a reasonable doubt, that a defendant knew the youth he enticed was under eighteen." *Chin*, 981 F.2d at 1280. And if experience proves our prediction wrong and the burden too onerous, the government is free to ask Congress to limit the statute's knowledge requirement.

Second, as noted above, our interpretation does not mean that Villanueva-Sotelo escapes punishment for his crime, for he pled guilty to violating 18 U.S.C. § 1546(a), which provides: "Whoever knowingly . . . uses, attempts to use, possesses, obtains, accepts, or receives . . . [an] alien registration receipt card . . . knowing it to be forged . . . [s]hall be fined under this title or imprisoned." Unlike section 1028A(a)(1), that statute unambiguously criminalizes Villanueva-Sotelo's conduct. We affirm.

*So ordered.*

KAREN LECRAFT HENDERSON *Circuit Judge*, dissenting:

At issue in this case is the proper interpretation of the following language of the Identity Theft Penalty Enhancement Act, Pub. L. 108-275, § 2(a), 118 Stat. 831 (ITPEA):

> Whoever, during and in relation to any felony violation enumerated in subsection (c), *knowingly* transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1) (emphasis added).[1]  The majority interprets this language to require that the Government prove that the defendant knew "the 'means of identification' he 'transfer[red], possesse[d], or use[d]' actually belonged to 'another person[.]' "  Maj. Op. at 2 (quoting 18 U.S.C. § 1028A(a)(1)) (alterations in majority opinion).  Because I believe the majority misreads this language, I respectfully dissent.

## I.

The facts are not in dispute.  Appellee Villanueva-Sotelo is a Mexican national who has entered the United States illegally at least three times and twice been returned to Mexico.[2]  On

---

[1] Among the felony violations enumerated in subsection (c) is any violation of "chapter 75 (relating to passports and visas)."  18 U.S.C. § 1028A(c)(7).  Villanueva-Sotelo pleaded guilty to violating subsection (7).  *See infra* pp. 13–15.

[2] On June 15, 1990, Villanueva-Sotelo was arrested in Oroville, Washington for shoplifting.  He pleaded guilty to misdemeanor theft and was sentenced to 10 days in jail.  On July 3, 1990, a United States immigration judge ordered Villanueva-Sotelo's removal from the United States and he was deported to Mexico.  *See* Factual Proffer in Support of Guilty Plea 2.  Villanueva-Sotelo re-entered the United States and was again arrested in Washington State.  He pleaded guilty

2

August 5, 2006, he was arrested and charged with, *inter alia*, aggravated identity theft under section 1028A(a)(1) after he presented a false Permanent Resident Card (Card)[3] to an officer of the Metropolitan Police Department (MPD) in the District of Columbia. *See* Indictment 2. Although the Card bore Villanueva-Sotelo's name and photograph, it contained a registration number assigned to another person. Villanueva-Sotelo admits knowing the Card was false; however, he contends that he did not know the registration number belonged to another person. For its part, the Government concedes that it cannot prove that Villanueva-Sotelo knew the number belonged to another person. *See* Gov't Br. 5.

On May 11, 2006, the Government charged Villanueva-Sotelo with unlawful re-entry of a removed alien (8 U.S.C. § 1326(a) and (b)(1)) (Count 1), possession of false immigration documents (18 U.S.C. § 1546(a)) (Count 2) and aggravated identity theft (18 U.S.C. § 1028A(a)(1)) (Count 3). Villanueva-

---

to unauthorized re-entry of a removed alien (8 U.S.C. § 1326), possession of false immigration documents (18 U.S.C. § 1546(a)) and possession of five or more false identification documents with intent to transfer (18 U.S.C. § 1028(a)(3)); he was sentenced to two months' incarceration. On September 23, 1991 he was again ordered deported to Mexico. *See id.*

[3]Until 2003 the Card, commonly known as a "green card," was issued by the Immigration and Naturalization Service (INS) of the U.S. Department of Justice. Since 2003, when many INS functions were transferred to the newly-created Department of Homeland Security, the U.S. Citizenship and Immigration Service (USCIS) began issuing them. *See* 6 U.S.C. § 271(b); 8 U.S.C. § 1103. The Card includes, *inter alia*, the alien's name, photograph, date of birth, country of origin, expiration date, fingerprint and an alien registration number assigned to him by the USCIS. *See, e.g.*, 8 U.S.C. §§ 1201, 1202(a)–(b), 1304(d) (requirements for immigrant visas); 8 C.F.R. § 264.5 ("Application for creation of record of permanent residence").

3

Sotelo pleaded guilty to the first two counts but challenged the aggravated identity theft count, arguing that under section 1028A(a)(1) the Government was required to establish that he knew the Card he presented contained the registration number "of another person." The district court agreed and dismissed Count 3, the aggravated identity theft count.[4] The Government then appealed and today the majority affirms the dismissal of Count 3.

## II.

At least two sister circuits have interpreted section 1028A(a)(1)'s language as unambiguously *not* requiring that the defendant know that the false "means of identification" belongs to another. *United States v. Hurtado*, 508 F.3d 603, 610 (11th Cir. 2007); *United States v. Montejo*, 442 F.3d 213, 217 (4th Cir.), *cert. denied*, 127 S.Ct. 366 (2006). A third circuit has followed the Fourth Circuit's rationale without additional analysis. *United States v. Hines*, 472 F.3d 1038, 1039–40 (8th Cir.), *cert. denied*, 128 S.Ct. 235 (2007). The majority's interpretation therefore causes a disfavored circuit split. *See United States v. Philip Morris USA Inc.*, 396 F.3d 1190, 1201 (D.C. Cir.) ("[W]e avoid creating circuit splits when possible . . . ."), *cert. denied*, 546 U.S. 960 (2005).[5] Its

---

[4] The district court thereby disagreed with the earlier decision of another district judge that section 1028A(a)(1) does *not* require the Government to prove that "the identification numbers on the fraudulent documents belonged to an actual person." *United States v. Contreras-Macedas*, 437 F. Supp. 2d 69, 76 (D.D.C. 2006).

[5] At the district court level there is also disagreement. The District of Maine first concluded that section 1028A(a)(1)'s mens rea requirement applies to "of another person" (by submitting to the jury the question whether the defendant knew her false means of identification belonged to someone else), *United States v. Godin*, 476 F. Supp. 2d 1, 3 (D. Me. 2007); it then reversed field and adopted the

4

disagreement with the other circuits is two-fold: it first finds the language ambiguous, *see* Maj. Op. at 4–15; it then construes the ambiguity in the defendant's favor. Maj. Op. at 22–23. Even if the Fourth, Eighth and Eleventh Circuits incorrectly view the language as unambiguous,[6] I nonetheless agree with their

---

Fourth Circuit's rationale. *United States v. Godin*, 489 F. Supp. 2d 118, 119 (D. Me. 2007). Other district courts have reached different conclusions. *Compare United States v. Beachem*, 399 F. Supp. 2d 1156, 1158 (W.D. Wa. 2005) (§ 1028A(a)(1)'s knowledge requirement applies to each element), *and United States v. Salazar-Montero*, No. CR 07-2020, 2007 WL 3102096, at *13 (N.D. Iowa Oct. 25, 2007) (same), *with United States v. Montejo*, 353 F. Supp. 2d 643, 654 (E.D. Va. 2005) (§ 1028A(a)(1)'s knowledge requirement does not modify "of another person"), *and United States v. Contreras-Macedas*, 437 F. Supp. 2d 69, 79 (D.D.C. 2006) (same).

[6]The decisions of the Supreme Court as well as of our Circuit have held that similarly worded criminal statutes—i.e., statutes containing the word "knowingly" followed by a verb or series of verbs, a direct object and at least one prepositional phrase describing that object—are ambiguous. *See Liparota v. United States*, 471 U.S. 419, 424, 425 n.7 (1985) (" Either interpretation would accord with ordinary usage. 'As a matter of grammar the statute is ambiguous; it is not at all clear how far down the sentence the word 'knowingly' is intended to travel . . . .' " (quoting W. LaFave & A. Scott, Criminal Law § 27 (1972))); *United States v. Chin*, 981 F.2d 1275, 1279 (D.C. Cir. 1992) (finding similarly structured criminal statute ambiguous: "One cannot tell from the words alone whether the person's juvenile status must be known . . . ."), *cert. denied*, 508 U.S. 903 (1993); *United States v. Nofziger*, 878 F.2d 442, 447(D.C. Cir. 1989) (finding similarly structured criminal statute " 'is ambiguous. The statute can be read either way.' " (quoting *United States v. O'Brien*, 686 F.2d 850, 852 (10th Cir. 1982)); *cf. Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005) ("We have recognized with regard to similar statutory language that the mens rea at least applies to the acts that immediately follow, if not to other elements down the statutory chain."); *see also*

5

reading of the language that the Government need not establish the defendant knew the false means of identification is that "of another person."

Because the majority views the provision as ambiguous, it looks beyond the words to discern their meaning. It then concludes that " 'the statutory structure, relevant legislative history, [and] congressional purposes expressed in the [statute]' " all support applying the knowledge requirement to every element of section 1028A(a)(1). Maj. Op. at 15–16 (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 737 (1985)) (alterations in majority opinion). It first places great emphasis on the word "theft" in the ITPEA's title. Apparently the majority believes that Villanueva-Sotelo's conduct does not constitute aggravated identity theft because his "accidental misappropriation," Maj. Op. at 22, of another's identification number—the "accident," I assume, relating to his ignorance of the fact that the identification he *knows* to be false is assigned to another person—would not constitute "theft." *See* Maj. Op. at 16 ("As th[e] title demonstrates, the statute concerns 'theft,' i.e., 'the felonious taking and removing of personal property *with intent to deprive the rightful owner of it.*' WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2369 (1993) (emphasis added); *see also* BLACK'S LAW DICTIONARY 1516 (8th ed. 2004) ('The felonious taking and removing of another's personal property with the intent of depriving the true owner of it.')"). According to the majority, the fact that the title uses the word "theft" shows that the Congress intended "to single out thieves—in the traditional sense of the word." *Id.* But determining the mens rea required to commit a federal offense does not necessarily entail finding a "common-law" match.

---

*McCreary v. Offner*, 172 F.3d 76, 82–83 (D.C. Cir. 1999) (noting other circuits' differing interpretations of statute manifest statute is ambiguous).

6

Instead it involves the " 'construction of the statute and . . . inference of the intent of Congress.' " *Staples v. United States*, 511 U.S. 600, 605 (1994) (quoting *United States v. Balint*, 258 U.S. 250, 253 (1922)) (ellipsis in original); *see also Liparota*, 471 U.S. 419, 424 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." (citing *United States v. Hudson*, 11 U.S. (7 Cranch) 32 (1812)). Here the Congress has made clear—in discussing the same title the majority reads as limited to common-law theft—that identity "theft" is a much broader offense than the majority prefers. The House Judiciary Committee Report accompanying the ITPEA explains that "the terms 'identity *theft*' and 'identity fraud' refer to *all types of crimes* in which someone *wrongfully obtains* and uses another person's personal data *in some way that involves fraud or deception*, typically for economic or other gain, including immigration benefits." H.R. Rep. No. 108–528, at 4 (2004) (emphases added) (House Report); *see also id.* at 25 (statement of Rep. Coble) ("Identity theft and identity fraud are terms used to refer to *all types of crimes in which an individual's personal or financial data is misused*, typically for economic gain or to facilitate another criminal activity." (emphasis added)). The Congress's synonymizing "identity theft" and "identity fraud"—followed by a definition that includes "all types" of crime "that involve[] fraud or deception"—could not make clearer that identity "theft" is meant to be read generically.[7]

_____

[7]Even assuming *arguendo* that we were required to harmonize aggravated identity theft with common-law theft, could not the majority's view be inconsistent with the common law? *See* Maj. Op. at 16 (defining "theft" as " 'the felonious *taking and removing* of personal property with intent to deprive the rightful owner of it' ") (emphasis added) (internal quotations omitted). In the majority's view, a defendant could be guilty of aggravated identity theft despite

7

The majority dismisses the House Report's discussion of the breadth of "identity theft" by positing that the Congress did not consider "imagin[ing] a string of random numbers" to be a "*wrongful*[]" way of possessing and/or using another person's "means of identification." *See* Maj. Op. at 18 (emphasis added). To support this notion, the majority points to a section of the House Report that includes several examples of techniques commonly used in identity theft (e.g., " 'dumpster diving,' " " 'hack[ing] into computers,' " and " 'steal[ing] paperwork likely to contain personal information,' " *id.* (quoting H.R. Rep. No. 108-528, at 4–5)) and lists "a string of cases in which convicted identity thieves escaped with relatively light sentences, all of which involved defendants who, unlike Villanueva-Sotelo, knew the identification they used belonged to another." *Id.* Finally, the majority highlights two statements from the floor debate to the same effect. *Id.* at 18 (quoting 150 Cong. Rec. H4809 (daily ed. June 23, 2004) (statement of Rep Sensenbrenner) (noting that "identity thieves" "sometimes [steal] hundreds or even thousands of identities"); *id.* at H4810

---

not having "take[en]" or "remov[ed]" another's "personal property" so long as he knows the false identification belongs to another. Nor does the identity thief "deprive" the owner of the latter's means of identification—if anything, he "shares" the owner's identity.

Moreover, depending on the context, "theft" often has a broader meaning than the common-law definition. *See, e.g., Montejo*, 353 F. Supp. 2d at 654 ("While 'theft' is a popular term often identified with 'larceny,' the word 'theft' [can also be] an umbrella term which includes other forms of wrongful taking." (quoting *McLaughlin v. City of Canton, Miss.*, 945 F. Supp. 954, 970 n.18 (S.D. Miss. 1995))); WEBSTER'S THIRD NEW WORLD DICTIONARY 2369 (including, in addition to the common-law definition of "theft"—which the majority cites—, "taking of property unlawfully"); BLACK'S LAW DICTIONARY 1486 (7th ed. 1999) (noting that theft, in addition to its common-law definition, can also mean "[b]roadly, any act or instance of stealing.").

8

(statement of Rep. Carter) (noting case wherein "Texas driver's license bureau clerk pleaded guilty to selling ID cards to illegal immigrants using stolen information from immigration papers")). To make the strongest argument for the enactment of the ITPEA, however, the drafters of the House Report understandably highlighted the most notorious cases in which defendants had received "light" punishment under the then-existing law. That a crime like Villanueva-Sotelo's—i.e., the knowing use of an false identification without also knowing the false identification belongs to another person—did not make the "worst case" list does not mean that Villanueva-Sotelo's conduct is not covered by section 1028A(a)(1).[8]

Indeed, I read the House Report to expressly manifest that the Congress *did* consider Villanueva-Sotelo's conduct covered. A primary purpose of the statute was to increase the punishment for a defendant who "wrongfully obtains and uses *another person's* personal data," H.R. Rep. No 108-528 at 4 (emphasis added), so that the punishment more closely fits the harm the crime causes its victim.[9] In concluding that the examples of

---

[8]Indeed, the House Report fails to mention other common forms of identity theft, e.g., a parent misappropriating a child's identity, *see e.g.*, John Leland, *Identity Thief Is Often Found in Family Photo*, N.Y. TIMES, Nov. 13, 2006, at A1 (describing parent-child identity fraud as commonplace).

[9]*See* 150 Cong. Rec. H4811 (statement of Rep. Schiff) ('A victim of identity theft usually spends a year and a half working to restore his or her identity and good name . . . . The current sentencing structure and practice is flawed because it does not reflect the impact on the victim, in addition to the impact and loss to the financial institution."). The Congress's central concern with the damage caused by the wrongful use of another person's identity rings throughout the legislative history. *See, e.g.*, H.R. Rep. No. 108–528, at 4 ("[T]he loss to businesses and financial institutions from identity theft [is estimated] to be $47.6 billion. The costs to individual consumers are

9

"identity theft" included in the House Report exhaustively describe the types of "wrongful" behavior the Congress intended to sanction, the majority has lost sight of the Congress's primary objective—stopping the nation-wide identity theft tidal wave by upping the ante for the thief.  It is preposterous to think the same Congress that so plainly and firmly intended to increase the penalty—"a mandatory consecutive penalty enhancement of 2

---

estimated to be approximately $5.0 billion."); *id.* at 25 (statement of Rep. Coble) ("In 2002, the FTC received 161,819 victim complaints of compromised personal information . . . .  [These] victims have a difficult time consuming [sic] an expensive task of repairing a damaged credit history as well as their respective reputations."); *id.* at 35 (statement of Rep. Scott) ("[T]he FTC reports [consumer identity theft] bilked almost 30 million Americans out of approximately $50 billion over the last 5 years, with about $5 billion of that out-of-pocket, unrecovered losses to consumers."); *id.* at 44 ("Identity theft victims now spend an average of 600 hours—often over a period of years—recovering from the crime.  Being a victim costs an average of $1,400 in out-of-pocket expenses . . . ."); *id.* at 51 (statement of Rep. Schiff) (noting that purpose of ITPEA is "to protect the good credit and reputation of hard-working Americans").

The Congress also enacted the ITPEA in order to increase the penalty for a terrorist who possesses a false means of identification. *See* 18 U.S.C. § 1028A(a)(2) (mandating five-year consecutive prison term for "knowingly transfer[ing], possess[ing] or us[ing], without lawful authority, a means of identification of another person or a false identification document" "during and in relation to any felony violation enumerated in section 2332b(g)(5)(B)" (i.e., a terrorism offense)); H.R. Rep. No 108–528, at 3 ("The bill also amends current law to impose a higher maximum penalty for identity theft used to facilitate acts of terrorism."); *id.* at 4 ("[A]l Qaida and other terrorist organizations increasingly turn to stolen identities to hide themselves from law enforcement.").  Significantly, the five-year consecutive sentence is to be imposed whether or not the false identification is that "of another person," manifesting that scienter "of another person" is not required.

10

years"—if the defendant possesses another's means of
identification "in order to commit a serious federal predicate
offense," *id.* at 10, would then so limit its imposition as to
require the Government to prove that the defendant *knows* he
wrongfully possesses the identity "of another person."[10] In this
respect, the majority ignores reality in "doubt[ing] that [its]
interpretation of section 1028A(a)(1) will saddle the government
with a burden it cannot meet." Maj. Op. at 28. Except for the
forger himself, proving beyond a reasonable doubt that each of
the thousands, if not millions, of holders of false green cards
knows that the false means of identification he possesses is that
"of another person" would "place[] on the prosecution [an] often
impossible burden." *United States v. Chin*, 981 F.2d 1275, 1280
(D.C. Cir. 1992), *cert. denied*, 508 U.S. 923 (1993). The
legislative history persuades me that the Congress considered
the unauthorized use of another person's means of identification
to be "wrongful" and therefore covered by section 1028A(a)(1)
whether done by "dumpster diving," "hacking into a computer
system" or "imagining a string of numbers."[11]

---

[10]Must the government also prove the defendant knows "another
person['s]" *identity*? I assume even the majority would not offer that
reading.

[11]I note just one example of a result that can fit within the
majority's seemingly benign "accidental misappropriation" label, Maj.
Op. at 22:

> One woman's Social Security identification number has
> been used by at least 81 people in 17 states. . . . [I]nformation
> gleaned from criminal investigations, tax documents and other
> sources suggest most of the users were probably illegal
> immigrants trying to get work.

> Audra Schmierer, a 33-year-old housewife in this affluent
> San Francisco suburb, realized she had a problem in February
> 2005, when she got a statement from the IRS saying she owed

11

---

$15,813 in back taxes—even though she had not worked since her son was born in 2000. Perhaps even more surprising, the taxes were due from jobs in Texas.

Schmierer has since found that her Social Security number has been used by people from Florida to Washington state, at construction sites, fast-food restaurants and even major high-tech companies. Some opened bank accounts using the number.

\* \* \*

Under current law, if the Social Security Administration or the Internal Revenue Service find multiple people using the same Social Security number, the agencies send letters informing employers of possible errors.

The IRS can fine employers $50 for each inaccurate number filed, a punishment that companies often dismiss as just another cost of doing business.

"Sending letters is the limit to what can be done," Social Security spokesman Lowell Kepke said. "We expect that will be able to fix any records that are incorrect."

The information on mismatched names is seldom shared with law enforcement agencies.

\* \* \*

Schmierer has done a little investigating of her own, combing through tax bills sent to her for names and locations of employers who hired people using her number.

She has also obtained more than 200 W-2 and 1099 tax forms that contained her Social Security number but different names.

\* \* \*

Schmierer filed a police report after learning one man had used her information in 2003 at janitorial and landscaping

12

companies near Haltom City, Texas.

Investigators found the man, who told officers he had bought a fake Social Security card at a flea market, according to a police report.  He was not arrested.

* * *

What started as a hassle turned into a major headache earlier this year when she sought work through a temporary agency that learned her Social Security number had been used by a woman in Texas two years earlier.  The agency could not hire Schmierer for more than a month while the situation was clarified.

"How do you prove that you are you?" Schmierer said. "It's like you are guilty until proven innocent."

While returning from a trip to Mexico with her husband last year, Schmierer was detained for four hours in a Dallas airport by immigration officials.  The reason: a woman using her Social Security number was wanted for a felony.

* * *

Schmierer's number became so compromised that Social Security officials finally took a rare step used only in extreme cases:  They gave her a new one.

Peter Prengaman, *One Social Security Number, 81 People*, CBS NEWS, June 17, 2006, *available at* http://www.cbsnews.com/ stories/2006/06/17/national/main1726397.shtml?source=RSS&attr= HOME_1726397.

Whether the people who had these cards had obtained Schmeier's social security number through "dumpster diving," "hacking into a computer system" or simply "imagining a string of numbers," the harm Schmierer suffers is the same.  Can the Congress really have intended to prevent the repetition of nightmares like Schmierer's by punishing more severely only that thief (from among the 81) who knows that the purloined social security number is a real one?

13

But resort to legislative history and congressional intent is not even necessary if the meaning of the language is discernible from a construction of the language under review together with language *in pari materia*.  We have often held that if the Congress had intended language in legislation to have a certain disputed meaning, "it would have said so more clearly." *Bluewater Network* v. *E.P.A.*, 370 F.3d 1, 18 (D.C. Cir. 2004); *see also Gustafson* v. *Alloyd Co.*, 513 U.S. 561, 575 (1995); *Consumer Fed'n of Am.* v. *U.S. Dep't. of Health & Human Servs*, 83 F.3d 1497, 1503 n.6 (D.C. Cir. 1996) ("[H]ad Congress [so] intended . . ., it presumably would have drafted the statute differently . . . .").  Here the Congress "could have drafted the statute to prohibit the knowing transfer, possession, or use, without lawful authority, of the means of identification 'known to belong to another actual person.' " *United States v. Hurtado*, 508 F.3d 603, 609 (11th Cir. 2007).  This is precisely what the Congress did in 18 U.S.C. § 1546(a)—the predicate offense Villanueva-Sotelo pleaded guilty to in Count 2, triggering the enhanced penalty of section 1028A(a)(1).  Section 1546(a) makes it illegal to:

> utter[], use[], attempt[] to use, possess[], obtain[], accept[], or receive[] any [forged, counterfeited, altered or falsely made] . . . document prescribed by statute or regulation . . . as evidence of authorized stay or employment in the United States, *knowing it to be forged, counterfeited, altered, or falsely made*, or to have been procured by means of any false claim or

---

The majority points out the obvious fact that this news report post-dates by some two years the enactment of the ITPEA.  Maj. Op. at 28.  I highlight it, of course, not as legislative history but as an example of what the majority's oxymoronic "accidental misappropriation" interpretation will work.

14

> statement, or to have been otherwise procured by fraud
> or unlawfully obtained.

18 U.S.C. § 1546(a) (emphasis added). By this language the
Congress plainly intended that Villanueva-Sotelo *know* that the
Card he presented to the MPD officer was forged, counterfeited,
altered or falsely made. The fact that the Congress chose not to
use the same language in section 1028A(a)(1)—a provision
whose enhancement expressly incorporates 18 U.S.C. § 1546(a)
(with its differing language) and which therefore must be given
a construction *in pari materia*[12]—persuades me that it did not

---

[12]"Statutory provisions *in pari materia* normally are construed
together to discern their meaning." *Motion Picture Ass'n of Am., Inc.
v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002) (citing *Erlenbaugh v.
United States*, 409 U.S. 239, 244 (1972)).

> To be in pari materia, statutes need *not* have been
> enacted simultaneously or refer to one another. . . .
> However, the rule that statutes in pari materia should
> be construed together has the greatest probative force
> . . . or *in the case where the later of two or more
> statutes relating to the same subject matter refers to
> the earlier.* In these situations the probability that
> acts relating to the same subject matter were based on
> the same policy is very high.

2B SUTHERLAND STATUTORY CONSTRUCTION § 51:3 (6th ed. 2000)
(emphases added) (footnotes omitted); *see, e.g., Estate of Hendrick v.
Comm'n*, 918 F.2d 1263, 1266 (6th Cir. 1990) (tax statutes
" 'specifically cross referenc[ing]' " each other construed *in pari
materia*) (quoting *Estate of Leder v. Comm'n*, 893 F.2d 237, 241 (10th
Cir. 1989)); *United States v. Rodriguez*, 60 F.3d 193, 196 (5th Cir.
1995) ("explicit cross reference" supported construing U.S.S.G.
§ 5C1.2 and Fed. R. Crim. P. 32(c) *in pari materia*); *Mimkon v. Ford*,
332 A.2d 199, 203 (N.J. 1975) ("[T]he rule most obviously
applies . . . . where [the statutes in question] make specific reference
to one another . . . ." (citing 2A SUTHERLAND STATUTORY

15

intend to require Villanueva-Sotelo to know that the Card he presented was that "of another person" in order to violate section 1028A(a)(1). If it *had* so intended, it would have phrased section 1028A(a)(1) as explicitly as it did section 1546(a); for example, "a means of identification known to belong to another person."[13] The fact that Villanueva-Sotelo is, in my view, guilty of both Count 2 (which he admits) and Count 3 (of which he professes his innocence) based on the *same* mens rea does not mean the charges are duplicative. Villanueva-Sotelo can commit the predicate offense set out in section 1546(a) whether or not the false means of identification belongs to another; if it *does* belong to another, that is, if it fits the *description* set out in section 1028A(a)(1), Villanueva-Sotelo has also committed the "aggravated" offense and thereby added a mandatory two-years' consecutive imprisonment to his punishment.

Moreover, a comparison of sections 1028A(a)(1) and 1028A(a)(2) also demonstrates that the Congress did not intend "knowingly" to modify "of another person." Subsection (a)(2) provides for a five-year penalty enhancement for anyone who "during and in relation to" a terrorist act (per 18 U.S.C. § 2332b(g)(5)(B)):

---

CONSTRUCTION § 51.03 (Sands ed. 1973)); *Keith v. Lockhart*, 88 S.E. 640, 642 (N.C. 1916) (construing two statutes *in pari materia* when "the later statute . . . in express terms refers to . . . the former). Because Section 1028A(c)(7) expressly incorporates by reference section 1546(a) and because both sections, as well as section 1028A(a)(1), relate to the same subject matter (possession of a false means of identification), they are to be construed *in pari materia*.

[13]*See, e.g.*, 18 U.S.C. § 922(q)(2)(A) ("It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at *a place that the individual knows*, or has reasonable cause to believe, *is a school zone*.") (emphases added).

16

> knowingly transfers, possesses, or uses, without lawful
> authority, [1] a means of identification of another
> person or [2] *a false identification document* . . . .

18 U.S.C. § 1028A(a)(2) (emphasis added). The second prong
of this subsection demonstrates the Congress's intent that a
terrorist's knowledge that he possesses a "false" identification
document supplies all the culpability necessary to commit
aggravated identity theft. Thus, when subsection (a)(1) uses the
identical phrase in speaking of one who "knowingly . . .
possesses . . ., without lawful authority, a means of identification
of another person," the scienter requirement is satisfied if the
defendant knows that he possesses "a means of identification"
"without lawful authority." The phrase "of another person" is,
in effect, jurisdictional language describing the "means of
identification" that triggers an additional penalty.[14]

   Both the majority and I spill a lot of ink on dueling canons
of statutory construction. *See supra* pp. 13–16; Maj. Op at
4–10, 25–28. Perhaps our exchange illustrates little more than
that, in construing statutes, courts have a variety of interpretive
aids to choose from. The *first* principle of statutory
construction, however, is to apply common sense in the reading
of language. *See United States v. Howell*, 78 U.S. 432, 436
(1870) ("[O]ne of the first canons of construction teaches us to

---

[14]Construing 1028A(a)(1) and 1028A(a)(2) together also reveals
that the majority's emphasis on the word "theft" in the ITPEA's title
is misplaced. Under the second prong of section 1028A(a)(2) a
defendant can be convicted of aggravated identity theft despite the fact
that he has not misappropriated—accidently or otherwise—another
person's identity. That the knowing possession of "a false
identification document" suffices to violate section 1028A(a)(2)
makes clear that the Congress intended identity "theft" to be construed
broadly—in some instances not even requiring the "traditional" theft
the majority describes.

17

avoid if possible [a result] which is at war with the common sense . . . ."); *Roschen v. Ward*, 279 U.S. 337, 339 (1929) ("[T]here is no canon against using common sense in construing laws as saying what they obviously mean."); *Nat'l Rifle Ass'n of Am., Inc. v. Reno*, 216 F.3d 122, 127 (D.C. Cir. 2000). Common sense tells me that the Congress, seeking to stop a type of crime that is increasing on an almost daily basis, enhanced the penalty to effect its purpose. And it is anything but common sense to conclude that the same Congress intended to gut that enhanced penalty, as the majority's reading does.

Finally, I believe the majority misinterprets Supreme Court precedent. That precedent teaches that "[t]he presumption in favor of scienter requires a court to read into a statute *only* that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.' " *Carter v. United States*, 530 U.S. 255, 256–57 (2000) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)) (first emphasis added). For example, in *Liparota v. United States*, 471 U.S. 419 (1985), the Supreme Court interpreted the mens rea requirement of a statute which prohibited "knowingly us[ing], transfer[ing], acquir[ing], alter[ing], or possess[ing] [food] coupons," 7 U.S.C. § 2024(b)(1), "in any manner not authorized by statute or regulations." *Liparota*, 471 U.S. at 426. At issue was whether the "knowledge" requirement applied to each element of the offense—i.e., whether the defendant was required to know that he was using food stamps "in a manner not authorized by statute or regulations." *Liparota*, 471 U.S. at 426. The Court found the language of the food stamp statute ambiguous and noted that the legislative history did not clarify the scope of the mens rea requirement. *See id.* at 424–25. The Court ultimately held that the "knowledge" requirement applied to each element of the offense, emphasizing its desire to avoid "criminaliz[ing] a broad

18

range of apparently innocent conduct."[15]  *Id.* at 426.

In *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994), the Supreme Court expressed the same concern in interpreting a statute which criminalized "knowingly" transporting, shipping, receiving, distributing or reproducing sexually explicit material involving minors.[16]  The Court

---

[15]The Court explained:

[The statute] declares it criminal to use, transfer, acquire, alter, or possess food stamps in any manner not authorized by statute or regulations.  The statute provides further that "[c]oupons issued to eligible households shall be used by them only to purchase food in retail food stores which have been approved for participation in the food stamp program *at prices prevailing in such stores.*" 7 U.S.C. § 2016(b) . . . This seems to be the *only* authorized use.  A strict reading of the statute with no knowledge-of-illegality requirement would thus render criminal a food stamp recipient who, for example, used stamps to purchase food from a store that, unknown to him, charged higher than normal prices to food stamp program participants.  Such a reading would also render criminal a nonrecipient of food stamps who "possessed" stamps because he was mistakenly sent them through the mail due to administrative error, "altered" them by tearing them up, and "transferred" them by throwing them away.  Of course, Congress *could* have intended that this broad range of conduct be made illegal, perhaps with the understanding that prosecutors would exercise their discretion to avoid such harsh results.  However, given the paucity of material suggesting that Congress did so intend, we are reluctant to adopt such a sweeping interpretation.

*Liparota*, 471 U.S. at 426–27 (emphases and alterations in original) (citations and footnote omitted).

[16]The statute allowed criminal charges to be brought against any person who "knowingly transports or ships in interstate or foreign

19

believed that under the "most grammatical reading of the statute," *id.* at 70, "knowingly" would modify only the immediately surrounding verbs (i.e., "transports or ships"). This construction, however, would allow conviction even if the defendant was not aware that the materials were sexually explicit or that the actors were minors. *Id.* at 68. The Court chose not to give the "most natural," *id.*, reading of the statute, instead extending the mens rea requirement to each element of the offense. It explained that "the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct." *Id.* at 72 (discussing *Morissette v. United States*, 342 U.S. 246 (1952) and *Staples v. United States*, 511 U.S. 600 (1994)). Otherwise:

> a retail druggist who returns an uninspected roll of developed film to a customer "knowingly distributes" a visual depiction and would be criminally liable if it were later discovered that the visual depiction contained images of children engaged in sexually explicit conduct. Or, a new resident of an apartment might receive mail for the prior resident and store the mail unopened. If the prior tenant had requested delivery of [explicit] materials . . . his residential successor could be prosecuted for "knowing receipt" of such materials. Similarly, a Federal Express courier who delivers a box in which the shipper has declared the contents to be "film" "knowingly transports" such film. We do not assume that Congress, in passing laws, intended such results.

*Id.* at 69–70. The Court characterized this result as "not merely

------

commerce . . . any visual depiction, if . . . the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2252(a).

20

odd, but positively absurd." *Id.* at 69.[17]

There is no similar danger that innocent or unwitting conduct might be penalized under section 1028A(a)(1) because a conviction can be had *only* if the defendant has used another person's means of identification during or in relation to one of

---

[17]Until today, our decisions have been to the same effect. For example, in *United States v. Chin*, 981 F.2d 1275 (D.C. Cir. 1992), *cert. denied*, 508 U.S. 923 (1993), we held that under 21 U.S.C. § 861(a)(2)—which prohibits anyone who illegally distributes a controlled substance from "knowingly and intentionally . . . employ[ing] . . . a person under eighteen years of age to assist"—the Government need not prove the defendant knew his accomplice was under eighteen. We noted that "this is not an instance in which a broad interpretation of a statute threatens to criminalize 'apparently innocent conduct.' " *Id.* at 1280 (quoting *Liparota*, 471 U.S. at 426). We explained that "[a] conviction under 21 U.S.C. § 861(a)(2) can be had only upon proof that the person knowingly and intentionally" used another person to distribute controlled substances. *Id.* Because the distribution of narcotics is hardly an innocent act, we held that the Government was not required to prove that the defendant knew his accomplice was under eighteen. *Cf. United States v. Williams*, 922 F.2d 737, 738–39 (11th Cir.) (interpreting same subsection and concluding Government need not prove defendant knew minor's age), *cert. denied*, 502 U.S. 892 (1991); *United States v. Valencia-Roldan*, 893 F.2d 1080, 1083 (9th Cir.) (same), *cert. denied*, 495 U.S. 935 (1990); *United States v. Carter*, 854 F.2d 1102, 1108–09 (8th Cir. 1988) (same). In *United States v. Holland*, 810 F.2d 1215, 1223–24 (D.C. Cir.), *cert. denied*, 481 U.S. 1057 (1987); we held that under 21 U.S.C. § 845a (recodified as 21 U.S.C. § 860)—which prohibited the sale of controlled substances within 1000 feet of a elementary or secondary school—the Government need not prove that the defendant knew that a school was within 1000 feet because such reading was not necessary to avoid "criminaliz[ing] a broad range of apparently innocent conduct.' " *Id.* at 1223.

21

the felony offenses enumerated in section 1028A(c).[18] Section
1028A(a)(1) functions as any "other federal law[] which
provide[s] enhanced penalties or allow[s] conviction for
obviously antisocial conduct upon proof of a fact of which
defendant need not be aware.' " *United States v. Montejo*, 442
F.3d 213, 216–17 (4th Cir. 2006) (quoting *United States v.
Cook*, 76 F.3d 596, 601 (4th Cir. 1996)); see, e.g., *United States
v. Feola*, 420 U.S. 671, 684 (1975) (upholding penalty
enhancement under 18 U.S.C. § 111 for any person who assaults
federal officer whether or not he knows victim is, in fact, federal
officer);[19] *see also United States v. LaPorta*, 46 F.3d 152, 158
(2d Cir. 1994) (defendant not required to know torched building
was government property because "[a]rson is hardly otherwise
innocent conduct" (quotation omitted)); *United States v. Falu*,
776 F.2d 46, 50 (2d Cir. 1985) (Drug Free School Zone Act:
"This construction . . . does not criminalize otherwise innocent
activity"); *United States v. Hamilton*, 456 F.2d 171, 172–73 (3d
Cir.) (in Mann Act prosecution, defendant not required to know

---

[18]As noted earlier, Villanueva-Sotelo admitted knowing the Card
he possessed was false and that his possession of the Card was illegal,
*see* Factual Proffer 3, unlike the *Liparota* defendant who professed his
ignorance of any unlawful conduct.

[19]The *Feola* Court reasoned that:

[its] interpretation [of § 111] poses no risk of unfairness to
defendants. It is no snare for the unsuspecting. Although the
perpetrator . . . may be surprised to find that his intended
victim is a federal officer in civilian apparel, he nonetheless
knows from the very outset that his planned course of conduct
is wrongful. The situation is not one where legitimate
conduct becomes unlawful solely because of the identity of
the individual [victim]. . . . [T]he offender takes his victim as
he finds him.

*Feola*, 420 U.S. at 685.

22

minor transported across state line for immoral purpose was under eighteen; "knowingly" held to refer only to act of transportation), *cert. denied*, 406 U.S. 947 (1972). In these cases—where the defendant can "hardly be surprised to learn that [his behavior] is not an innocent act," *see United States v. Freed*, 401 U.S. 601, 609 (1971)—the courts have made it the defendant's duty to " 'ascertain[,] at his peril whether [his actions] come[] within the inhibition of the statute.' " *Id.* (quoting *United States v. Balint*, 258 U.S. 250, 253–54 (1922)). It is well settled that we must "presum[e] that Congress was aware of [the Court's] . . . judicial interpretations," *Keen Corp. v. United States*, 508 U.S. 200, 212 (1993), including "[t]he presumption in favor of scienter [that] generally requires a court to read into a statute *only* that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.' " *Carter*, 530 U.S. at 257 (quoting *X-Citement Video*, 513 U.S. at 72) (first emphasis added). Applying the presumption here, I cannot help but conclude that the Congress intended the violation of section 1028A(a)(1) to hinge on the defendant's knowing use of a means of identification known to be false without his also having to know the false identification is that "of another person."

In sum, I would hold, as has every other circuit that has construed this language, *see United States v. Montejo*, 442 F.3d 213 (4th Cir.), *cert. denied*, 127 S.Ct. 366 (2006); *United States v. Hines*, 472 F.3d 1038 (8th Cir.), *cert. denied*, 128 S.Ct. 235 (2007); *United States v. Hurtado*, 508 F.3d 603 (11th Cir. 2007), that section 1028A(a)(1) of the ITPEA does not require the Government to prove that the defendant know that the false "means of identification" he possesses is that "of another person." 18 U.S.C. § 1028A(a)(1).[20]  Accordingly, I would

---

[20]I believe the rule of lenity is inapplicable here, even if only as an alternative holding. *See* Maj. Op. at 22–23. *See Chapman v. United*

23

reverse the district court's dismissal of Count 3, charging Villanueva-Sotelo with a violation of 18 U.S.C. § 1028A(a)(1).

---

*States*, 500 U.S. 453, 463 (1991) (rule of lenity "is not applicable unless there is a 'grievous ambiguity or uncertainty in the language and structure of the Act,' . . . such that even after a court has 'seize[d] everything from which aid can be derived,' it is still 'left with an ambiguous statute.' ") (quoting *Huddleston v. United States*, 415 U.S. 814, 831 (1974); *United States v. Bass*, 404 U.S. 336, 347 (1971)). To the extent the relevant language is ambiguous, it is far from "grievously" so; legislative history and statutory language *in pari materia* clear it up nicely.